UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No. 8:17-cr-513-T-27CPT

REGINALD LEE BLACK
_____/

## REPORT AND RECOMMENDATION

Before me is Defendant Reginald Lee Black's *Motion to Suppress Tangible Evidence* obtained by law enforcement on July 17, 2016, August 8, 2016, and September 9, 2016 (Doc. 30), as well as the *United States' Response in Opposition to Defendant's Motions [sic] to Suppress* (Doc. 33).

An all-day evidentiary hearing was held on Black's motion on April 3, 2018 (April 3 hearing) (Doc. 40), after which the government submitted a *Notice of Filing* referencing certain additional evidence it requested the Court to consider (Doc. 41). An official transcript of the April 3 hearing was filed on April 10, 2018. (Doc. 42).

Following a studied review of that transcript as well as the parties' submissions, a supplemental hearing was held on May 18, 2018 (May 18 hearing), to clarify the arguments raised by counsel. (Doc. 46). An official transcript of that hearing was filed on May 30, 2018. (Doc. 50).

In the interim, on May 29, 2018, Black filed an *Unopposed Motion to Supplement the Record* with additional evidence, as well as a *Notice of Filing* regarding two recent

Supreme Court cases he believed to be of relevance: *Byrd v. United States*, 138 S. Ct. 1518 (2018) and *Collins v. Virginia*, ___ S. Ct. ___, 2018 WL 2402551 (May 29, 2018). (Docs. 48, 49). The Court granted Black's motion to supplement the record on June 1, 2018. (Doc. 53).

Upon a thorough review and consideration of all of the evidence and case authority tendered by the parties, including Black's recent supplemental submissions, I recommend that Black's motion be denied.

## BACKGROUND

### I.  July 17, 2016, Arrest of Black on a Violation of Probation Warrant

On the evening of July 17, 2016, Tampa Police Department (TPD) Officer David Miller was on patrol with fellow Officer Anthony Skolarus looking to execute a warrant for Black's arrest. (Doc. 42 at 17-19, 44). That arrest warrant stemmed from a violation of probation (VOP) that Black allegedly committed following his conviction in state court for possession of cocaine and obstructing a crime scene. *Id.* at 44, 158.

At the time Miller was looking to execute this arrest warrant, he was serving on TPD's Rapid Offender Control squad and had developed experience in investigating credit card fraud during his roughly seven years as a full-time member of the force. *Id.* at 12-14, 16-17. Earlier that year, Miller and another TPD Officer had initiated a fraudulent credit card investigation of a group of approximately fifty individuals with whom Black was allegedly involved. *Id.* at 32-36, 47, 55. Known as "Swipe and Go," the fraudulent credit card investigation was being jointly conducted with the FBI. *Id.*

2

at 32-33.  Because of the fraud investigation, Miller ran Black's name in TPD's computer system when he came to work on July 17, 2016, and discovered that Black was then the subject of the VOP warrant.  *Id.* at 33-34, 37.

When Miller set out to arrest Black on July 17, he knew from prior experience that Black was associated with a white Jaguar.  *Id.* at 15-16, 19, 25.  According to the evidence adduced at the April 3 hearing, that Jaguar did not belong to Black and was not registered in his name.  *Id.* at 193, 223.  Instead, it was owned by one of Black's neighborhood friends, Jenae Dawes, who allowed Black and other individuals to use the vehicle.  *Id.* at 113-14, 193-94, 197-98, 225, 234.  At all times relevant to his motion, Black was not authorized to drive the Jaguar or any other car because his license was suspended.  *Id.* at 95-96, 192, 200.

In an effort to locate Black that evening, Miller and Skolarus went to the area of Tampa they knew Black to frequent, including the 3200 block of Jean Street.  *Id.* at 15-19.  It was on that street that Miller and Skolarus ultimately found Black in or near the Jaguar.  *Id.* at 19, 39, 159, 193.  The officers arrested Black and seized an iPhone, cash, and a VISA card from his person.  *Id.* at 20, 42-43, 46, 53-54, 56.

Miller and Skolarus thereafter transported Black to TPD District 3 to interview him and to complete the necessary arrest paperwork.  *Id.* at 20-21, 44-45.  According to Miller, upon arriving at District 3, he advised Black of his *Miranda* rights using either a card he kept in a pouch in his tactical vest or the warnings contained on TPD

"Form 310." *Id.* at 21, 52-53.[1]  Miller testified that Black said little, if anything, to Miller while they were at District 3. *Id.* at 21, 41.

Miller and Skolarus then placed Black back into their police vehicle to transport him to the Orient Road Jail where he was to be housed while awaiting an appearance on the VOP warrant. *Id.* at 21, 47.  Pursuant to TPD policy, Miller occupied the driver seat of the police car, Black the passenger seat, and Skolarus the rear seat. *Id.* at 22, 39-40, 90.  According to Miller, while still in the parking lot at District 3, he allowed Black to use the iPhone seized from Black earlier that evening because Black had "repeatedly" told Miller he wanted to call his girlfriend and because Miller "was being a nice guy." *Id.* at 21, 41, 88-90.  Miller testified that he usually permitted people who were cooperative to make such calls to their significant others. *Id.* at 41, 88-90.  Although not entirely sure, Miller believed that Black's hands were handcuffed in front of him at the time or were not handcuffed at all. *Id.* at 42, 90.

According to Miller, when he gave Black the iPhone, Black immediately began deleting photos that appeared to be from a website used by those involved in credit card fraud. *Id.* at 22, 90.  Miller testified that, from his position next to Black in the front seat, he could see that the photos contained individuals' names, dates of birth, Social Security numbers, and credit card information. *Id.* at 22, 50-51.  Believing that the phone contained evidence of fraud, Miller retrieved it from Black and sought and

---

[1] Miller testified that TPD employs Form 310 for a number of purposes in addition to advising a person of his/her *Miranda* rights, including, of relevance here, to memorialize a person's consent to search his/her vehicle or property. *Id.* at 53.

obtained Black's verbal consent to search it.  *Id.* at 22-23, 48-53.  Miller subsequently

had Black memorialize his consent on Form 310.  *Id.*

Miller thereafter spoke to Black about the deleted photos.  *Id.* at 23, 51.

According to Miller, Black stated that a female sent him the photos, that he knew the

woman only by her nickname, "Kiki," and that the credit card information on the

websites could be used to purchase food.  *Id.* at 23-24.  Black also provided Miller with

the code to unlock the phone.  *Id.* at 23.  Following this interview, Black was

transported to the Orient Road Jail and released several days later.  *Id.* at 53, 56.

## II.    August 8, 2016, Traffic Stop Involving Black and a White Jaguar

On August 8, 2016, Miller and another TPD Officer, John Gustafson, were

seeking to further the fraudulent credit card investigation by attempting to surveil

Black.  *Id.* at 24-25, 59-61.  According to Miller, he and Gustafson were in an

undercover vehicle and observed the same white Jaguar with which Black was

associated traveling at a "high rate of speed."  *Id.* at 25, 59-61, 63, 85-86.  Miller, who

was driving and knew that Black had a suspended license, followed the Jaguar for

roughly four to five minutes.  *Id.* at 59, 63.  Miller testified that, during that time

period, he had to engage in "evasive maneuvers" to catch up with Jaguar, which was

"moving pretty fast."  *Id.* at 63, 86.  Miller further testified that once he and Gustafson

"actually [got] behind the car," they determined it was traveling approximately 48

m.p.h. in a 35 m.p.h. zone.  *Id.* at 25, 87.  Due to the heavy tint on the Jaguar's

windows, however, Miller and Gustafson were unable to observe who was driving the

vehicle.  *Id.* at 26-27.

Miller and Gustafson ultimately stopped the car for speeding and then approached the vehicle. *Id.* at 25. Miller made contact with the driver, who turned out to be Ashleigh Walden, while Gustafson made contact with the passenger, who turned out to be Black. *Id.* at 26, 64. Miller made a number of inquiries to Walden, including asking for her driver's license, registration, and insurance. *Id.* at 27, 65. Walden did not have a driver's license, but did provide Miller with her name. *Id.* In accordance with TPD's "standard operating procedure," Miller returned to his car to run Walden's name in several databases, including Florida's driver and vehicle identification system. *Id.* at 27, 65-67. While Miller was engaging in these tasks, Gustafson spoke with Black. *Id.* at 27. As a result of his database searches, Miller discovered that Walden had a suspended license. *Id.* at 27, 65-67, 82.

Upon Miller's return to the Jaguar, Gustafson told Miller he had noticed a credit card embosser next to Black's feet when he first made contact with Black. *Id.* at 28, 70. Based on the officers' experience, they knew such embossers to be utilized to make fraudulent credit cards. *Id.* Gustafson also told Miller that he had detected a "slight odor of marijuana" coming from Black, and that Walden and Black had consented to a search of the Jaguar. *Id.* at 27, 69-73. Both Black and Walden disputed this account, however, and testified that they neither used marijuana nor agreed to have the car searched. *Id.* at 167, 172, 202, 206, 231-35, 242.

Miller and Gustafson then had Walden and Black exit the vehicle so they could search it. *Id.* at 28, 69, 165-66, 233. That search led to the seizure of, among other items, the embosser on the floorboard, as well as Black's identification card and

numerous fraudulent cards with his name on them in the glove compartment. *Id.* at 28-30, 77-79.[2] The officers did not find any marijuana either on Black or in the Jaguar, however. *Id.* at 72. On the stand, Black disclaimed any ownership of the embosser and testified that it was located on the floorboard in the back seat, not in the front. *Id.* at 171, 202.

According to Miller, he and Gustafson thereafter conducted "a post-*Miranda* interview" of Black, who advised that he received credit cards in the mail all the time but did not know why. *Id.* at 30-31, 75-77, 173. After the interview, Miller gave Walden a verbal warning and allowed her and Black to leave the scene with the instruction that they could not drive the vehicle. *Id.* at 31. Walden and Miller testified that the entire stop took anywhere between ten minutes (Walden) to "[m]aybe" twenty-five to thirty minutes (Miller). *Id.* at 31, 233.

III.   **Attempted Traffic Stop of the White Jaguar on September 3, 2016, and the Subsequent Warrantless Arrest of Black on September 9, 2016**

On September 3, 2016, TPD Officer David Ford was working midnight patrol when he received a radio communication from TPD's aviation unit, known as Air Service,[3] that it had observed a white Jaguar run a stop sign. *Id.* at 98, 114. Ford was familiar with the Jaguar from a July 2016 incident in which Black fled from the vehicle on foot and knew the car belonged to Black's then-girlfriend, Jenae Dawes. *Id.* at 98-

---

[2] Miller and Gustafson also seized a pill bottle from the Jaguar, but the government advised at the April 3 hearing that it would not seek to introduce that item into evidence. *Id.* at 252-53.
[3] According to Ford, Air Service's role includes monitoring the roadways "for traffic infractions, reckless drivers, stop sign violations," and the like. *Id.* at 97.

99, 113-14.  Ford also knew Black from two separate incidents in December 2015 in which he and another TPD Officer, Albis Maceo, had seen and later arrested Black for driving a vehicle (an Infiniti) without a valid driver's license.  *Id.* at 94-95.

After receiving the communication from Air Service on September 3, Ford caught up with the Jaguar and activated his emergency lights and siren.  *Id.* at 99.  The driver of the car refused to stop, however, and sped away.  *Id.*  Pursuant to TPD policy, Ford did not attempt to chase the vehicle, but instead radioed Air Service so that it could maintain a visual on the car.  *Id.* at 99-100.  Air Service thereafter monitored the Jaguar (including by video) and later advised Ford that the driver and a passenger had abandoned the car and fled on foot.  *Id.* at 100, 114-15.  One of those individuals was ultimately apprehended and interviewed by Ford.  *Id.* at 100-01.  Although that individual confessed to being a passenger in the Jaguar, he declined to identify the driver.  *Id.* at 101.  Officer Maceo, who was also working that evening, later told Ford that he saw Black driving the Jaguar after it had run the stop sign but before it had been abandoned.  *Id.* at 101-02.[4]

Based on the above information, Ford completed a criminal arrest affidavit for Black for fleeing to elude and driving with a suspended license.  *Id.* at 102-03, 105. According to Ford, that criminal arrest affidavit – known as a "probable cause pick-up" – was thereafter signed by Ford and his supervisor, and authorized sworn TPD members to arrest Black within a thirty-day period.  *Id.* at 103-09.  The affidavit

---

[4] At the April 3 hearing, Black asserted that his friend Keshard was the passenger in the Jaguar on September 3, and that the driver was Terrell Cobbs (a/k/a "Rad").  *Id.* at 209-11, 223-24.

included, among other information, the date, time, and location of the alleged

offenses; a narrative describing the probable cause for the arrest; and the Florida

statutes Black had allegedly violated. *Id.* at 102-03. Ford submitted the probable

cause pick-up to TPD's communication center, which then distributed it to TPD's

patrol officers. *Id.* at 103-07, 110-11.

On September 9, 2016, six days after the entry of the probable cause pick-up,

TPD Officer Jason Lambeth and his partner, Officer John Simpkins, went to arrest

Black at an apartment complex where Black apparently resided with Rokerria

Williams. *Id.* at 125-27, 131-33, 146-47, 177. By that point, Lambeth knew Black was

the subject of a fraudulent credit card investigation and had been found in the

possession of counterfeit credit cards earlier that summer by Miller and Gustafson. *Id.*

at 125.

As Lambeth and Simpkins pulled up to Black's apartment complex, they

observed Black in the front parking lot reaching into the driver's seat area of an

unoccupied black Infiniti with its engine running. *Id.* at 127-28, 132-34, 179-80, 215-

17. According to Lambeth, the driver's side door of the vehicle was open at the time

and he could see multiple credit cards, as well as Black's identification, in plain view

in the driver's side door pocket. *Id.* at 128, 134-35, 215-16. Lambeth believed the

credit cards to be counterfeit because of the manner in which they were packaged, the

fact that Black was then a suspect in a fraudulent credit card investigation, and the fact

that Miller and Gustafson had recently seized counterfeit credit cards from Black. *Id.*

at 128-29, 146.  Lambeth and Simpkins thereafter arrested Black and took him into custody. *Id.* at 127, 129, 135, 143, 180-81, 224-25.

In light of Lambeth's discovery of the suspected counterfeit credit cards, a supervisor involved in the fraudulent credit card investigation instructed Lambeth to impound the Infiniti. *Id.* at 130, 136, 143-44.  According to the evidence adduced at the April 3 hearing, that vehicle belonged to Tonyialisa Roundtree (who was the mother of one of Black's deceased friends), was used by multiple other individuals, and had only been "temporarily" lent to Williams and Black that morning. *Id.* at 144-45, 178-79, 213-14, 225.  Once the Infiniti was impounded, Lambeth and a crime scene technician searched it and apparently seized the credit cards along with a number of other items. *Id.* at 129, 142.  A subsequent investigation confirmed that the credit cards were, in fact, counterfeit. *Id.* at 129.

## DISCUSSION

In his motion and as he clarified at the April 3 and May 18 hearings, Black seeks to suppress the evidence that law enforcement obtained from him and the two vehicles (*i.e.*, the Jaguar and the Infiniti) on July 17, 2016, August 8, 2016, and September 9, 2016. *See* (Doc. 30 at 10-23; Doc. 42 at 246-57; Doc. 50 at 2-24). Although he also originally sought to suppress evidence secured after September 9, 2016 (Doc. 30 at 20-22), the government advised at both the April 3 and May 18 hearings that such evidence would not be introduced at trial and therefore need not be addressed by the Court (Doc. 42 at 251; Doc. 50 at 20-24).

I.    **July 17, 2016, Seizure of Evidence from Black's Person and His Subsequent Statements to Law Enforcement**

Black's sole argument in support of his motion to suppress the evidence stemming from his July 17, 2016, arrest is that the arresting officers unlawfully used the VOP warrant as a pretext to further their fraudulent credit card investigation, and that the resulting evidence therefore constitutes the "fruit of the poisonous tree." (Doc. 30 at 10; Doc. 50 at 2-10).   I find this argument unavailing.

As a threshold matter, it is evident from the testimony adduced at the April 3 hearing that the VOP warrant upon which Black's arrest was predicated was both valid and active at the time.  *See, e.g.*, (Doc. 42 at 56) (warrant for Black's arrest was "[a] real warrant . . . issued by the judge").  While there was some suggestion at the hearing that Black's former attorney arranged to resolve this probation violation at an upcoming court appearance, *id.* at 161-63, no evidence was presented that the warrant had been either withdrawn or rescinded.  Nor does Black seriously argue as much.  *See id.* at 254 (acknowledging government had a warrant to arrest Black "whether or not it was negotiated to be something that was going to be resolved in court"); (Doc. 30 at 10) ("begrudgingly conced[ing]" that law enforcement had "a valid VOP warrant" for Black's arrest).

Black likewise acknowledged both in his motion and at the April 3 and May 18 hearings[5] that the type of pretext argument he asserts here has been rejected repeatedly by the Supreme Court.  *See, e.g., Arkansas v. Sullivan*, 532 U.S. 769, 771-72 (2001)

---

[5] (Doc. 30 at 10; Doc. 42 at 255; Doc. 50 at 5-6).

(officers' "'[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis'") (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)); *see also United States v. Alston*, 598 F. App'x 730, 733-34 (11th Cir. 2015) ("[B]oth this Court and the Supreme Court have rejected inquiry into an officer's subjective intentions in reviewing the constitutionality of searches and seizures under the Fourth Amendment") (citations omitted).[6]

While acknowledging this longstanding precedent, Black suggests that the Supreme Court may now be inclined to revisit it in light of Justice Ginsberg's recent concurrence in *District of Columbia v. Wesby*, 138 S. Ct. 577 (2018). In *Wesby*, Justice Ginsberg opined that she would "leave open, for reexamination in a future case, whether a police officer's reason for acting, in at least some circumstances, should factor into the Fourth Amendment inquiry." *Id.* at 594 (Ginsberg, J., concurring). While I appreciate Black's advocacy, I respectfully decline his invitation to uproot well-entrenched Supreme Court jurisprudence based on conjecture that, at some unknown date in the future and under some as yet undefined set of circumstances, one Justice may seek to delimit that precedent in a manner that would provide Black relief here.

Accordingly, I recommend that the Court deny Black's motion to suppress evidence obtained in connection with his July 17, 2016, arrest.

---

[6] "Unpublished opinions [by the Eleventh Circuit] are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2.

II.    **August 8, 2016, Seizure of Evidence from the Jaguar and Black's Attendant Statements to Law Enforcement**

Black seeks to suppress the items seized from the Jaguar on August 8, 2016, including the credit card embosser, the identification card, and the fraudulent cards, as well as the statements he made to law enforcement that day. (Doc. 30 at 10-15; Doc. 42 at 252-54). In support of this request, Black argues that the stop of the vehicle was pretextual and otherwise unwarranted; that the subsequent search of the car was not supported by probable cause, was unduly prolonged, and was not conducted with Walden and Black's consent; and that Black's statements to law enforcement constitute the "poisoned fruit" of the allegedly unlawful stop. (Doc. 30 at 10-15; Doc. 50 at 11-16, 20).

A.    *Black's Challenges to the August 8 Traffic Stop of the Jaguar*

Before resolving Black's challenges to the August 8 traffic stop, I must first address the threshold issue of whether he has standing to contest that stop. *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) ("proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure"); *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998). I find that he does. Based on the testimony adduced the April 3 hearing, there is little question that Black was a passenger in the Jaguar at the time it was pulled over. Under well-settled Supreme Court precedent, Black's status as an occupant of the vehicle affords him standing to challenge the constitutionality of the stop. *Brendlin v. California*, 551 U.S. 249, 251 (2007) (holding that passengers, like the driver, are

13

seized for Fourth Amendment purposes when police make a traffic stop and therefore

may challenge stop's constitutionality); *Lewis v. United States.*, 491 F. App'x 84, 85

(11th Cir. 2012) (same).

While I find that Black has standing to contest the August 8 traffic stop, I find

that his challenges to the stop are without merit. As with his July 17 arrest, his

contention that the August 8 stop was merely a pretext by law enforcement to further

its fraudulent credit card investigation is irrelevant under longstanding Supreme Court

jurisprudence and provides him with no basis for relief. *See Sullivan*, 532 U.S. at 771-

72; *Whren*, 517 U.S. at 813.

Black's assertion that the stop was unwarranted is similarly unfounded.

According to the evidence adduced at the April 3 hearing, the Jaguar was traveling at

a high rate of speed when Miller and Gustafson first encountered it, was later seen

weaving in and out of traffic, and was ultimately determined to be going 48 m.p.h. in

35 m.p.h. zone. (Doc. 42 at 86-87). Under the circumstances, the officers had ample

justification to believe that the driver of the vehicle had committed a traffic infraction

and could be validly pulled over. *Whren*, 517 U.S. at 810 ("As a general matter, the

decision to stop an automobile is reasonable where the police have probable cause to

believe that a traffic violation has occurred."); *Terrell v. Smith*, 668 F.3d 1244, 1251-52

(11th Cir. 2012) ("we have held repeatedly that a law enforcement officer may stop a

vehicle for violating traffic laws or applicable equipment regulations").

B.       *Black's Challenges to the August 8 Search of the Jaguar*

Black's challenges to the subsequent search of the Jaguar present an independent issue of standing.  I note in this regard that, even though he has standing to contest the constitutionality of the August 8 stop, Black still bears the burden of showing that the search of the vehicle violated his Fourth Amendment rights.  *Rakas*, 439 U.S. at 130 n.1; *Cooper*, 133 F.3d at 1398.

To meet this burden, Black must establish that he had a legitimate expectation of privacy in the vehicle.  *Byrd v. United* States, 138 S. Ct. 1518, 1526 (2018) (citing *Rakas*, 439 U.S. at 143); *Rawlings v. Kentucky*, 448 U.S. 98, 104-05 (1980).  This requires that Black, in turn, show that he had a subjective expectation of privacy in the car and that this expectation is one that society is willing to recognize as reasonable.  *California v. Ciraolo*, 476 U.S. 207, 211 (1986); *United States v. Maxi*, 886 F.3d 1318, 1325-26 (11th Cir. 2018).  The resolution of this two-pronged inquiry involves a consideration of a number of factors, including whether Black (1) possessed a property interest in the Jaguar, (2) had the right to exclude others from it, and (3) exhibited a subjective expectation that the car would remain free from governmental invasion.  *Byrd*, 138 S. Ct. at 1527; *Rawlings*, 448 U.S. at 105-06; *United States v. Jackson*, 2013 WL 5304061, at *6 (M.D. Fla. Sept. 20, 2013) (listing relevant factors to be considered).

Black failed to tender any evidence at the April 3 hearing that he had a subjective expectation of privacy with respect to the Jaguar.  Indeed, Black sought to

distance himself on the stand from both the car and at least some of the contents found inside it.   As an example, Black testified:

> Q.    You heard law enforcement officers talk about having seen you in . . . [the Jaguar] several times.  Why are you in that car on more than one occasion.
>
> A.    It was my friend's car.  For one, they had arrested me in it after my curfew one time, so they was like oh, this [sic] your car.  How does my car --- it's not my car.

*Id.* at 198.

Black similarly disavowed any knowledge of the embosser that the officers found in the vehicle and made clear it did not belong to him.  *Id.* at 171 (embosser "wasn't mine.  It was in the car.  I don't know why it was in the car.  It wasn't mine"); *id.* at 202 (embosser "didn't belong to me").  Such disclaimers of ownership deprive Black of the requisite standing to challenge the seizure of that item.  *United States v. Thompson*, 171 F. App'x 823, 828 (11th Cir. 2006).[7]

Even if Black established that he had a subjective expectation of privacy in the Jaguar, it is not one that society is prepared to recognize as reasonable.  As noted above, at the time of the challenged search, Black was merely a passenger in the

---

[7] Black offered conflicting testimony as to whether the fraudulent cards and other items seized from the glove box belonged to him.  He indicated on direct examination, for example, that he told the police that the "stuff from the car," including the "stuff out of the glove compartment," were not his and instead were owned by the registered owner of the vehicle. (Doc. 42 at 169, 172).  On cross examination, however, Black contradicted these assertions, testifying that the items in the glove box had his name on them, that he had put them in there, and that he had previously bought them for $100 from someone named "Reshay."  *Id.* at 202-06

vehicle, not the driver. (Doc. 42 at 26, 164, 201). He also did not own the car or have a possessory interest in it. *Id.* at 198.

Furthermore, Black did not tender any credible evidence at the April 3 hearing that he took precautions to maintain his privacy in the Jaguar or that he had the right to exclude others from the vehicle. In fact, the evidence demonstrated that the owner of the car allowed multiple individuals besides Black to use it. (Doc. 42 at 225, 234). Black made this equally clear on the stand during the following exchange:

Q.      . . . The vehicle that you were talking about that belongs to Ms. Dawes [*i.e.,* the Jaguar]?

A.      Yes.

Q.      Did she loan that out to other people to drive?

A.      Yes, she did.

Q.      So you weren't the only one that was ever in that vehicle?

A.      No, sir.

(Doc. 42 at 225).

The driver of the Jaguar at the time of the August 8 stop, Ashleigh Walden, similarly testified that the Jaguar was "loaned out" to other individuals and that others drove it. *Id.* at 234.

Based on this evidence, I find that Black has not met his burden of establishing that he had a legitimate expectation of privacy in the Jaguar under the circumstances here. *See Rakas*, 439 U.S. at 148-50; *United States v. Ubaldo-Viezca*, 398 F. App'x 573,

579 (11th Cir. 2010) ("[b]ecause [defendant] was merely a passenger and did not own or rent the vehicle, he could not raise a Fourth Amendment challenge to the search of the vehicle") (citing *United States v. Lee*, 586 F.3d 859, 864 (11th Cir. 2009) (passenger who was neither driver nor owner of vehicle did not have standing to challenge weapon found in glove box)); *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008) (passenger with no possessory interest in automobile does not have legitimate expectation of privacy in car's interior because he does not have right to exclude others from vehicle); *United States v. Dericho*, 2015 WL 5687766, at *15 (M.D. Fla. Sept. 25, 2015) (finding that defendant, "as an occupant in a vehicle he neither owned nor leased and upon failing to otherwise assert any interest in the vehicle, had no expectation of privacy in the [car] and lacks standing to challenge the search thereof") (citation omitted); *Jackson*, 2013 WL 5304061, at *6 (defendant did not have legitimate expectation of privacy in vehicle where he was only a passenger, did not have any possessory interest in the car, did not have any right to exclude others from it, and did not take any precautions to maintain any subjective expectation of privacy in the vehicle).

The Supreme Court's recent decision in *Byrd*, *supra*, does not alter my conclusion. In that case, the defendant, Terrence Byrd, was driving a rental vehicle when he was pulled over by a state trooper for a possible traffic infraction. 138 S. Ct. at 1523-24. During the course of the traffic stop, the trooper noticed that Byrd, who was the only person in the car, was not on the rental agreement. *Id.* at 1524-25. Believing that Byrd therefore did not have a legitimate expectation of privacy in the

18

vehicle, the trooper conducted a warrantless search of the car and found body armor and forty-nine bricks of heroin in the trunk. *Id.* at 1525.

Byrd thereafter moved to suppress this evidence on the grounds that the search violated his Fourth Amendment rights. *Id.* The District Court denied the motion and the Court of Appeals for the Third Circuit affirmed, finding that Byrd lacked standing to contest the search because he was not listed on the rental agreement. *Id.*

In a unanimous opinion, the Supreme Court vacated the Court of Appeals' decision, "hold[ing] that, as a general rule, someone in otherwise lawful possession and control of a rental car has a reasonable expectation of privacy in it even if the rental agreement does not list him or her as an authorized driver." *Id.* at 1524.   In reaching this conclusion, the Court looked to both common-law "'property concepts'" as well as "understandings that are recognized and permitted by society." *Id.* at 1526-27 (quoting *Rakas,* 439 U.S. at 144 n.12).  Finding that "[t]he two concepts in cases like this one are often linked," the Court noted that "'[o]ne of the main rights attaching to property is the right to exclude others,' and, in the main, 'one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of the right to exclude.'" *Id.* at 1527.

Applying these property concepts and societal understandings to the facts before it, the Court in *Byrd,* as it had done in prior cases, "rejected the argument that legitimate presence alone was sufficient to assert a Fourth Amendment interest." *Id.* at 1528.  Of significance here, the Court also echoed Justice Powell's observation in his concurring opinion in *Rakas* that "a 'distinction . . . may be made in some

circumstances between the Fourth Amendment rights of *passengers* and the rights of an individual who has exclusive control of an automobile or of its locked compartments.'" *Id.* (quoting *Rakas*, 439 U.S. at 154) (Powell, J., concurring) (emphasis added)).

Noting that Byrd was "not . . . a passenger . . . but instead the driver and sole occupant" of the rental car, the Court found his situation to be similar to that of the defendant in *Jones v. United States*, 362 U.S. 257 (1960), who was deemed to have "a reasonable expectation of privacy in his friend's apartment because he 'had complete dominion and control over the apartment and could exclude others from it.'" *Byrd*, 138 S. Ct. at 1528 (internal quotation marks and citation omitted). Highlighting that even "the [g]overnment conceded . . . that an unauthorized *driver* in sole possession of a rental car would be permitted to exclude third parties from it," the Court in *Byrd* "s[aw] no reason why the expectation of privacy that comes from lawful possession and control and the attendant right to exclude would differ depending on whether the car in question is rented or privately owned by someone other than the person in current possession of it." *Id.* at 1528-29 (emphasis added).

The Court's decision in *Byrd* provides Black with no relief here. Black has not shown that, under the particular circumstances in this case, he had lawful possession of and "dominion and control" over the Jaguar such that he had the right to exclude others from the vehicle. Nor could he. As noted above, he was neither the owner nor the driver of the car. Nor did he exclusively utilize it. Indeed, by all accounts, the owner of the Jaguar liberally lent the car out to others to both drive and use.

Even if Black did have a legitimate expectation of privacy in the Jaguar, the search of the Jaguar was nonetheless lawful.  The government posits two arguments in this regard: (1) Black and Walden consented to the search of the vehicle; and (2) there was probable cause to search the car under the "automobile exception" to the warrant requirement.

After a careful review of the record, I find that the greater weight of the evidence does not support the government's consent argument.  While Miller testified that Gustafson told Miller he had obtained Black and Walden's consent, Miller conceded that he did not know the circumstances under which Gustafson procured that consent, including what Gustafson said to Black and Walden or what Black and Walden said in response.  (Doc. 42 at 64-65, 69-70).  Furthermore, unlike the July 17, 2016, search of Black's iPhone where Black admitted that he signed a written consent form (*i.e.,* Form 310), both Black and Walden testified that they did not consent to the August 8 search.  *Id.* at 167, 172, 202, 231-32, 234, 242.

The government's contention that the search of the Jaguar was warranted under the automobile exception is more persuasive.  As the Supreme Court noted in *Byrd*, the automobile exception emanates from the Court's longstanding recognition "that there is a diminished expectation of privacy in automobiles, which often permits officers to dispense with obtaining a warrant before conducting a lawful search."  138 S. Ct. at 1526.  The justifications for this exception are grounded in two particular characteristics of the automobile: its "ready mobility" and the "pervasive regulation" to which it is subject.  *Collins v. Virginia*, ___ S. Ct. ___, 2018 WL 2402551, at *4 (May

29, 2018) (citing *California v. Carney*, 471 U.S. 386, 390, 392 (1985)).  "When these [two] justifications . . . 'come into play,' officers may search an automobile without having obtained a warrant so long as they have probable cause to do so."  *Id.* at *5 (quoting *Carney*, 471 U.S. at 392-93).

To fall within the ambit of the automobile exception, the government must establish that "(1) the vehicle [wa]s readily mobile (*i.e.,* operational); and (2) agents ha[d] probable cause to believe the vehicle contain[ed] contraband or evidence of a crime."  *United States v. Tamari*, 454 F.3d 1259, 1261 (11th Cir. 2006).  The automobile exception "allows searches for evidence relevant to offenses other than the offense of arrest."  *Arizona v. Gant*, 556 U.S. 332, 347 (2009).

In this case, there is no question that the Jaguar was operational at the time of the search.  In an effort to show that there was also probable cause to search it, the government solicited testimony at the April 3 hearing that Black smelled of marijuana. I find the evidence in support of this putative justification underwhelming.  Although Miller testified that Gustafson detected "a slight odor of marijuana coming from . . . [Black's] person," (Doc. 42 at 71), Miller also testified that he did not smell any odor of marijuana, *id.* at 72-73, and that no marijuana was found in the car, *id.* at 72.  In addition, even though Black was apparently on probation at the time, the government did not introduce any records indicating that he had used any drugs – much less marijuana – while under supervision.  Furthermore, both Black and Walden disavowed using the substance.  *Id.* at 206, 235.

While the greater weight of the evidence does not support the government's contention that there was probable cause to search the Jaguar for marijuana, I find that there was probable cause to search the vehicle for evidence of credit card fraud. By the time of the traffic stop, TPD and the FBI had already been conducting a substantial counterfeit credit card investigation of Black and others. Further, only three weeks earlier, on July 17, 2016, they had obtained incriminating evidence from Black and his iPhone directly linking him to this illicit activity. In addition, during the course of the stop, Gustafson observed the credit card embosser – which both he and Miller knew to be utilized to make fraudulent credit cards – laying on the floorboard next to Black's feet in plain view. (Doc. 42 at 28, 70); *United States v. Bautista-Villanueva*, 524 F. App'x 476, 478 (11th Cir. 2013) (officers expected to use their experience to draw inferences from the cumulative information available to them, including inferences that may evade untrained observers). While Black testified he "th[ought]" that this embosser was located on the floorboard in the rear (not the front) seat of the vehicle, (Doc. 42 at 171), he did not suggest, much less assert, that it was hidden or otherwise not in plain view. Because the totality of the circumstances indicated that there was a "fair probability that contraband or evidence" related to credit card fraud would be found in the Jaguar, Miller and Gustafson were entitled to search it. *See United States v. Willix*, 2018 WL 705643, at *3 (11th Cir. 2018) (citing *Tamari*, 454 F.3d at 1262).[8]

---

[8] The fact that Miller did not cite the discovery of the embosser as a basis for the search during his testimony at the April 3 hearing does not govern my analysis. *See United States v. Hogan,*

Contrary to Black's suggestion at the April 3 hearing, it is of no moment that some of the seized evidence was obtained from the glove box. Because probable cause existed to search the Jaguar for evidence of credit card fraud, Miller and Gustafson were entitled to search those areas of the vehicle – including the glove compartment – where such evidence might be found. *United States v. Ross*, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.").

It is also of no significance, as Black asserts, that the credit card embosser is not, in and of itself, illegal. The Supreme Court has made clear that probable cause "merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband . . . or useful as evidence of a crime." *Texas v. Brown*, 460 U.S. 730, 742 (1983) (internal quotations and citations omitted); *see also United States v. O'Campo*, 381 F. App'x 974, 976 (11th Cir. 2010) (same). Here, for the reasons stated above, Miller and Gustafson had ample reason to believe that the embosser constituted contraband and useful evidence of credit card fraud based on their experience investigating such illicit activity.

Black's contention that the search was not performed within a reasonable time period after the stop was made is similarly unavailing. As a general matter, a traffic stop "exceeding the time needed to handle the matter for which the stop was made

---

684 F. App'x 904, 907 (11th Cir. 2017) ("court must evaluate any alternative justifications for a seizure without regard to the rationale employed by an officer at the time of the arrest or detention") (citing *Devenpeck v. Alford*, 543 U.S. 146, 152-56 (2004)).

violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015). As the Supreme Court explained in *Rodriguez*, a police officer's "mission includes ordinary inquiries incident to [the traffic] stop" in addition to issuing a ticket or warning. *Id.* at 1615 (internal quotation marks and citation omitted). Those inquiries "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (citations omitted).

"[O]nce effectuating a legal stop, however, an officer has 'the duty to investigate suspicious circumstances that then [come] to his attention.'" *United States v. Cantu*, 227 F. App'x 783, 785 (11th Cir. 2007) (quoting *United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir. 1991)). "Furthermore, an officer can lengthen the detention if he has reasonable suspicion of illegal activity other than the traffic violation, or if the detention has become a consensual encounter." *Id.* (citing *United States v. Pruitt*, 174 F.3d 1215, 1220 (11th Cir. 1999)); *see also United States v. Vargas*, 848 F.3d 971, 974 (11th Cir. 2017).

In this case, Gustafson noticed the embosser in plain view next to Black's feet during the initial stages of the traffic stop and long before Miller completed his inquiries regarding the stop, including those pertaining to Walden's suspended license. As noted above, the presence of the embosser provided Miller and Gustafson with more than a sufficient basis to believe that illegal activity, other than the traffic violation, was afoot. As such, they were entitled to investigate the matter, including by searching the Jaguar. There is nothing to suggest that Miller and Gustafson did not

complete their search or the processing of the traffic stop in a diligent and prompt manner.  Indeed, the entire stop – including the search – took as little as ten minutes (according to Walden) and at most twenty-five to thirty minutes (according to Miller). (Doc. 42 at 31, 233).  Under the circumstances, I find that the duration of the stop was reasonable.  *Cf. United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004) (thirty minutes reasonable for *Terry* stop under the circumstances) (and cases cited therein).

Because the greater weight of the evidence demonstrates that the August 8, 2016, stop of the Jaguar was lawful, that Black did not have a legitimate expectation of privacy in the vehicle, and that Miller and Gustafson's search of the car was supported by probable cause in any event, I recommend that Black's motion to suppress the evidence obtained as a result of the August 8 stop be denied.

III.   **September 9, 2016, Warrantless Arrest of Black, the Seizure of Evidence from the Infiniti, and Black's Subsequent Statements to Law Enforcement**

In his motion and as he clarified at the April 3 and May 18 hearings, Black seeks to suppress the evidence obtained by law enforcement on September 9, 2016, on the grounds that this evidence constitutes the fruit of his allegedly unlawful arrest that day.  (Doc. 30 at 16-20; Doc. 42 at 246-52; Doc. 50 at 16-20, 23-24).  In support of this contention, Black argues that the arrest was (1) not supported by probable cause; (2) made without a warrant; and (3) based on a probable cause pick-up that was not issued by the arresting officers.  *Id.*  Black separately seeks to suppress the evidence seized from the Infiniti on the grounds that law enforcement did not have a warrant to

search the vehicle, that Black did not consent to the search, and that the car was improperly impounded. *Id.*

A.   *Black's Challenges to his September 9 Warrantless Arrest*

It is well-settled that warrantless arrests are constitutionally valid if they are supported by probable cause. *Wesby*, 138 S. Ct. at 586; *United States v. Goddard*, 312 F.3d 1360, 1362-63 (11th Cir. 2002) ("The Fourth Amendment permits warrantless arrests in public places where an officer has probable cause to believe that a felony has occurred."). "To determine whether an officer had probable cause for an arrest, . . . [courts must] examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Wesby*, 138 S. Ct. at 586 (quotations and citations omitted). "Probable cause is not a high bar," and "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.*

Upon a careful examination of the evidence adduced at the April 3 hearing, I find that there was probable cause to support Black's arrest for fleeing to elude and driving with a suspended license. According to Ford's testimony, which I credit, the Jaguar that Black was seen with on July 17, 2016, and August 8, 2016, sped away from Ford on September 3, 2016, after the driver of the vehicle failed to stop at a stop sign and after Ford had activated his emergency lights and siren. While Ford could not discern who was in the car at the time, he knew that the vehicle belonged to Black's then-girlfriend, Jenae Dawes, and that Black had driven the car in July 2016 before fleeing from it on foot. (Doc. 42 at 98-99, 113-14). Furthermore, another

officer, Albis Maceo (who had participated with Ford in a prior stop of Black), told Ford that he was able to identify Black as the driver. *Id.* at 101-02.[9] In addition, Ford knew from prior interactions with Black that Black's license had been revoked years before and that it had not since been reinstated. *Id.* at 95-96.[10]

I am similarly unpersuaded by Black's argument that the probable cause pick-up became stale in the six days between the Jaguar's flight on September 3 and Black's arrest on September 9.  Black has not propounded any cognizable reason as to why probable cause for the arrest would have dissipated in such a short period of time. Indeed, a survey of the case law – both published and unpublished – indicates that the only circumstance in which probable cause for a warrantless arrest might become stale is where the underlying information is subsequently discredited by additional information that comes to law enforcement's attention. *See, e.g., Russell v. Devereaux*, 389 F. App'x 557, 560 (7th Cir. 2010) (noting that "probable cause to make an arrest grows 'stale only if it emerges that it was based on since discredited information'" in rejecting a claim that probable cause was stale because nearly a year had passed between investigation and arrest) (quoting *United States v. Bizier*, 111 F.3d 214, 219 (1st

---

[9] The evidence (consisting of a video and a TPD "warrant hardcopy" report) that Black recently submitted as a supplement to the record does not alter my findings. *See* (Docs. 48, 53).  Notably, Black does not identify what particular significance these items have to his motion.  Nor am I able to discern any.  As best I can tell, the video merely depicts a portion of the high speed chase on September 3, after which two individuals apparently abandon the vehicle.  The hardcopy report similarly appears to be unexceptional.

[10] In light of my finding that there was probable cause to support Black's arrest for fleeing to elude and driving with a suspended license, I need not address the separate question of whether there was also probable cause to arrest him for another offense, such as credit card fraud.

Cir. 1997)); *United States v. Henderson*, 613 F.3d 1177, 1181 (8th Cir. 2010) (noting

similarly, but finding no intervening exculpatory act); *United States v. Ortiz-Hernandez*,

427 F.3d 567, 574 (9th Cir. 2005) ("If probable cause is established at any early stage

of the investigation, it may be dissipated if the investigating officer later learns

additional information that decreases the likelihood that the defendant has engaged, or

is engaging, in criminal activity.  A person may not be arrested, or must be released

from arrest, if previously established probable cause has dissipated."); *United States v.*

*Edwards*, 632 F.3d 633, 640 (10th Cir. 2001) (holding that "[i]f the police learn

information that destroys their probable cause to arrest a defendant, the arrest may

become illegal," but finding police had sufficient evidence to believe an offense had

occurred).  The record before me is devoid of any evidence that would show that the

information upon which Ford relied in entering his probable cause pick-up was

subsequently discredited by additional information that came to the attention of law

enforcement.

Black's contention that, although law enforcement may have had probable

cause to arrest him, they were constitutionally required to obtain an arrest warrant

beforehand is untenable.  Under Florida law, a law enforcement official is authorized

to effectuate a warrantless arrest of a person when, *inter alia*, "[a] felony has been

committed and [the official] reasonably believes that the person committed it;" or the

official "reasonably believes that a felony has been or is being committed and that the

person to be arrested has committed or is committing it."  Fla. Stat., § 901.15(2), (3).

"A warrantless arrest of an individual in a public place for a felony . . . is consistent

with the Fourth Amendment if the arrest is supported by probable cause." *Maryland v. Pringle*, 540 U.S. 366, 369-70 (2003) (citing *United States v. Watson*, 423 U.S. 411, 424 (1976); *Atwater v. Lago Vista*, 532 U.S. 318, 354 (2001) (stating that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender")).

The Supreme Court's decision in *Watson* is instructive, if not dispositive here. In that case, the Court reversed a lower court decision that found a warrantless arrest to be unconstitutional because the arresting officer had time to obtain a warrant beforehand. 423 U.S. at 414. The Court held that the "necessary inquiry" in such situations is "not whether there was a warrant or whether there was time to get one, but whether there was probable cause for the arrest." *Id.* at 417. The Court noted that a contrary holding "'would constitute an intolerable handicap for legitimate law enforcement,'" *id.* at 417 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 113 (1975), and would also contravene the longstanding statutory and common-law rule that permitted a peace officer to make a warrantless felony arrest "if there was reasonable ground" for doing so, *id.* at 416-419. Indeed, the Court observed that it "'ha[d] *never* invalidated an arrest supported by probable cause solely because the officers failed to secure a warrant." *Id.* at 417-18 (quoting *Gerstein*, 420 U.S. at 113) (emphasis added).

Significantly, the Court rejected the argument that Black implicitly makes in this case – namely, that the constitutionality of a warrantless arrest turns on the existence of a demonstrated exigency or some other specialized circumstance:

30

> Law enforcement officers may find it wise to seek arrest warrants where
> practicable to do so, and their judgments about probable cause may be
> more readily accepted where backed by a warrant issued by a magistrate.
> . . . But we decline to transform this judicial preference into a
> constitutional rule when the judgment of the Nation and Congress has for
> so long been to authorize warrantless public arrests on probable cause
> rather than to encumber criminal prosecutions with endless litigation
> with respect to the existence of exigent circumstances, whether it was
> practicable to get a warrant, whether the suspect was about to flee, and
> the like.

*Id.* at 423 (internal citations omitted).

Black's reliance on the Supreme Court's decision in *Coolidge v. New Hampshire*,
403 U.S. 443 (1971), in this regard is misplaced. *See* (Doc. 30 at 18). Contrary to
Black's suggestion, *Coolidge* addressed the matter of a *search* warrant, not an arrest
warrant. *See Coolidge*, 403 U.S. at 449. As such, it has no application here. *See
Watson*, 423 U.S. at 432 (Powell, J., concurring) ("historical and policy reasons"
justify the Court's "sustaining of a warrantless arrest upon probable cause, despite the
resulting divergence . . . [from] the constitutional rule governing searches . . .").

In short, while I note the Supreme Court's preference for arrests "backed by a
warrant," *Watson*, 423 U.S. at 423, Black has not identified any case authority that
would place him outside the ambit of well-settled Supreme Court precedent and the
Florida statute authorizing warrantless arrests. As a result, his challenge to the
constitutionality of the probable cause pick-up under the circumstances present here
must fail.

Nor do I find any constitutional prohibition regarding law enforcement's
reliance on the cumulative information developed by Ford and his fellow officers in

effectuating Black's arrest.  It is well-settled in this regard that, under the "collective knowledge" doctrine, an officer may assume probable cause exists where he receives information to that effect from other officers.  *Willix*, 2018 WL 705643, at *3 ("In determining whether there was probable cause, we may consider the collective knowledge of law enforcement officers involved, so long as 'they maintained at least a minimal level of communication during their investigation.'") (quoting *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985)); *Terrell*, 668 F.3d at 1252 (well-established that collective knowledge of investigating officers may be imputed to each participating officer); *Goddard*, 312 F.3d at 1362.

In Florida, the "collective knowledge" doctrine is referred to as the "fellow officer rule."  That rule provides that, "when an arresting officer was absent for a significant portion of events giving rise to probable cause, the arresting officer may rely upon his fellow officer's judgment about probable cause."  *Williams v. Miami Dade Police Dep't*, 297 F. App'x 941, 946 (11th Cir. 2008); *Terrell*, 668 F.3d at 1252 (citing *Voorhees v. State*, 699 So. 2d 602, 609 (Fla. 1997) (per curiam) (explaining that the fellow officer rule "allows an arresting officer to assume probable cause to arrest a suspect from information supplied by other officers"); *Dewberry v. State*, 905 So. 2d 963, 967 (Fla. Dist. Ct. App. 2005) ("The fellow officer rule, sometimes referred to as the collective knowledge doctrine, allows the collective knowledge of police investigating a crime to be imputed to each member of the investigation.  The reach of this doctrine has been extended to searches as well as arrests.")).

In light of this precedent, Black's argument that Lambeth was not allowed to rely on the probable cause developed by Ford and his fellow officers is unavailing.  I note in this regard that, according to Ford's testimony, which I again credit, he prepared a sworn "criminal report affidavit" on September 3 in support of the probable cause pick-up.  Contrary to Black's suggestion that this affidavit contained little useful information "other than the perpetrator's name," (Doc. 30 at 17), Ford testified that it contained Black's demographic information, a narrative describing the probable cause that had been developed, and the applicable Florida statutes Ford believed Black had violated, (Doc. 42 at 102, 106).  Once Ford completed his criminal affidavit and had a supervisor sign it, he provided it to TPD's communications center, which then transmitted the probable cause pick-up to TPD's patrol officers – including Lambeth – via the officers' laptop computers.  *Id.* at 103-111.  Based on the evidence before me, I find that the transmittal of this information in this manner was sufficient to satisfy the collective knowledge doctrine.

B.      *Seizure of Evidence from the Infiniti on September 9*

Black's efforts to suppress the evidence seized from the Infiniti are likewise without merit.  As a threshold matter, Black has not shown – as he must – that he had a legitimate expectation of privacy in this vehicle.  Assuming for the moment that he had permission to use the Infiniti, the evidence adduced at the hearing revealed that Black did not own the car nor was it registered in his name.  (Doc. 42 at 144-45, 178-79, 213, 225).  The evidence also revealed that Black did not have a possessory interest in the vehicle, did not have any right to exclude others from it, and did not take any

33

precautions to maintain any subjective expectation of privacy in it. *Id.* at 213, 225. Indeed, Black conceded on the stand that he and Rokerria Williams had only obtained the Infiniti that day, were using it "temporarily," and had never borrowed it previously. *Id.* at 179, 214. Black also admitted that, although others drove the Infiniti, he had never done so and was not even sitting inside the vehicle at the time of his arrest. *Id.* at 177-80, 213, 216-17, 225. These facts are fatal to Black's claim that he had a legitimate expectation of privacy in the car.

Even if Black did have a legitimate expectation of privacy in the Infiniti, law enforcement had probable cause to search it. *Michigan v. Thomas*, 458 U.S. 259, 261 (1982) (explaining that officers may conduct a warrantless search of an automobile even after the vehicle is impounded and in police custody); *United States v. Garcia*, 433 F. App'x 741, 744 (11th Cir. 2011) (same). According to the evidence adduced at the hearing, the vehicle was unquestionably operational, as the engine was running at the time Lambeth and Simpkins approached Black in the parking lot to arrest him. Further, Lambeth observed a number of credit cards in plain view in the pocket of the driver's side door. Notably, Black did not dispute that he was reaching into the driver's side door when Lambeth and Simpkins arrived, or that the credit cards were clearly visible in the driver's side door pocket. (Doc. 42 at 179-80, 215-17). Once Lambeth observed the credit cards, it was reasonable for him and his supervisor – who was involved in the fraud investigation and who was in contact with Lambeth that day – to infer that these cards were fraudulent based on the information available to them. That information included the manner in which the credit cards were packaged, the

34

prior seizure of counterfeit credit cards from Black earlier that summer, and the other incriminating evidence that law enforcement had developed against Black during the course of its fraud investigation.  The fact that that this evidence was not related to offenses underlying the probable cause pick-up is irrelevant.  *See Gant*, 556 U.S. at 347.

In light of my findings that Black did not have a legitimate expectation of privacy in the Infiniti and that the search of the vehicle was supported by probable cause in any event, I need not address Black's remaining argument that the search of the car cannot be justified as a valid inventory search.  (Doc. 30 at 18-19 & n.17); *cf. Willix*, 2018 WL 705643, at *2 n.2 (expressing doubt as to whether warrantless search of vehicle can be justified under inventory exception where vehicle is impounded solely because of its evidentiary value).

## CONCLUSION

For the reasons set forth above, I recommend that the Court DENY Black's motion to suppress (Doc. 30) in its entirety.

Respectfully submitted this 7th day of June 2018.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

## NOTICE TO PARTIES

A party has fourteen (14) days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding(s) or legal conclusion(s) the District Judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).

Copies furnished to:

Honorable James D. Whittemore, United States District Judge

Counsel of record